NOTICE

Decision filed 03/18/08. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

NO. 5-05-0394

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | |
|---|---|
| CHARLOTTE BESS, | ) Appeal from the |
| | ) Circuit Court of |
| Plaintiff-Appellee, | ) St. Clair County. |
| | ) |
| v. | ) No. 99-L-55A |
| | ) |
| DIRECTV, INC., | ) Honorable |
| | ) Robert P. LeChien, |
| Defendant-Appellant. | ) Judge, presiding. |

_____

JUSTICE DONOVAN delivered the opinion of the court:

The defendant, DirecTV, Inc. (DirecTV), appeals from an order of the circuit court of St. Clair County denying its motion to stay proceedings and to compel arbitration. DirecTV argues that the circuit court erred in finding that the arbitration agreement was procedurally and substantively unconscionable and, therefore, unenforceable. Initially, this court issued an opinion in this case affirming the circuit court's judgment. *Bess v. DirecTV, Inc.*, No. 5-05-0394 (July 10, 2007). After considering the merits of DirecTV's petition for rehearing, we now reverse.

BACKGROUND

DirecTV provides television programming services via satellite to consumers throughout the nation. To obtain these services, a potential DirecTV subscriber calls DirecTV and orders one or more of DirecTV's programming packages. DirecTV then activates the subscriber's service and mails the subscriber a copy of a contract, called "Customer Agreement" (Customer Agreement), along with the initial billing statement. The Customer Agreement sets forth the parties' rights and obligations and explains the terms and

1

conditions under which DirecTV provides its service.

On November 28, 1999, Charlotte Bess contracted with DirecTV for satellite television service, and DirecTV activated the requested service. The record is silent on where or how Bess acquired the equipment necessary to receive DirecTV service and whether or not she incurred any costs to acquire the equipment or have it installed. Thereafter, DirecTV mailed a copy of the October 1999 Customer Agreement and the first billing statement to Bess. The Customer Agreement provides that DirecTV will send the customer a billing statement once every 30 days, that the customer will pay each monthly bill in full, and that should DirecTV not receive the customer's payment before issuing her next statement, DirecTV may charge her an administrative late fee of up to $5. The administrative late fee is the subject of Bess's complaint.

The Customer Agreement specifies that if the customer does not accept the terms of the Customer Agreement, she should notify DirecTV immediately and DirecTV will cancel her DirecTV service. A customer who does not notify DirecTV of any objections to the Customer Agreement and who continues to receive DirecTV service is deemed to have accepted the terms of the Customer Agreement.

The Customer Agreement contains informal and formal dispute-resolution clauses. Under the informal dispute-resolution clause, the complaining party must first notify the other of a claim at least 60 days before starting any formal proceeding, so that the parties can attempt an informal resolution of the claim. The formal dispute-resolution clause (the arbitration provision) provides, in pertinent part:

"Formal Resolution. Except as provided in Section 8(d), if we cannot resolve a Claim informally, any Claim either of us asserts will be resolved only by binding arbitration. The arbitration will be conducted under the Commercial Arbitration Rules of the American Arbitration Association that are in effect at the time the

2

arbitration is initiated (referred to as the 'AAA Rules') and under the rules set forth in this Agreement. If there is a conflict between the AAA Rules and the rules set forth in this Agreement, the rules set forth in this Agreement will govern. **ARBITRATION MEANS THAT YOU WAIVE YOUR RIGHT TO A JURY TRIAL.** If you initiate the arbitration, you agree to pay a fee of $125 or, if less and you tell us in writing, the amount that you would pay to initiate a lawsuit against us in the appropriate court of law in your state. We agree to pay any additional fee or deposit required by the American Arbitration Association in excess of your filing fee. We also agree to pay the costs of the arbitration proceeding up to a maximum of one-half day (four hours) of hearings. Other fees, such as attorney's fees, expenses of travel to the arbitration[,] and the costs of a proceeding that goes beyond one-half day[,] will be paid in accordance with the AAA Rules. The arbitration will be held at a location within one hundred miles of your residence unless you and we both agree to another location."

The October 1999 Customer Agreement further states that it could be replaced by subsequent, updated agreements and that the customer would accept the terms of any subsequent agreements in the same manner that she agreed to the terms of the initial Customer Agreement–by continuing to accept DirecTV service.

According to the record in this case, Bess did not cancel her agreement for service upon receipt of the October 1999 Customer Agreement. The October 1999 Customer Agreement was replaced by the September 2001 Customer Agreement. The September 2001 version contains the same late-fee clause and the same arbitration provision as the October 1999 agreement. Although the September 2001 version also contained a "deactivation fee" provision, which stated that if the customer cancelled the service or if DirecTV deactivated the service because of the customer's failure to pay or some other breach on the customer's

3

part, DirecTV may charge up to $15, the 2001 Customer Agreement again provided that the customer would only be bound by these terms if the customer continues to receive service from DirecTV after reading it. Bess did not cancel her DirecTV service after DirecTV mailed her a copy of the September 2001 Customer Agreement. She remained a DirecTV customer at the time of this appeal.

On November 22, 2000, Bess filed a first amended complaint alleging that DirecTV's $5 administrative late fee violates Illinois law. The gist of Bess's complaint is that DirecTV's true cost for a late-paying customer is far below $5. Bess alleged that DirecTV's practice constituted unjust enrichment and violated both Illinois common law concerning liquidated damages and the Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1 *et seq.* (West 2000)).

By letter dated December 4, 2000, DirecTV notified Bess that it intended to avail itself of the parties' contractual dispute-resolution clause. On December 7, 2000, DirecTV filed a motion to stay the action in the circuit court and to compel arbitration. On March 27, 2003, the circuit court denied DirecTV's motion, concluding that the arbitration agreement was unconscionable and unenforceable because it did not provide for class arbitration. DirecTV appealed. In an opinion issued on August 24, 2004, this court reversed the circuit court's denial of DirecTV's motion to stay the proceedings and to compel arbitration, and it held that an arbitrator must determine whether the arbitration clause permits a class arbitration. *Bess v. DirecTV, Inc.*, 351 Ill. App. 3d 1148, 1153-54, 815 N.E.2d 455, 459-60 (2004). This court remanded the matter to the circuit court to determine the validity of the arbitration provision. *Bess*, 351 Ill. App. 3d at 1157, 815 N.E.2d at 462.

On remand, the parties briefed the other issues that Bess had raised in opposition to DirecTV's motion. Bess argued that the arbitration provision was procedurally and substantively unconscionable and that she had not voluntarily and knowingly waived her

4

right to a trial by jury. In its order entered June 1, 2005, the circuit court found that Bess had abandoned the issue regarding the waiver of her right to a jury trial. The court determined that the arbitration provision was procedurally and substantively unconscionable, and it denied DirecTV's motion to compel arbitration. DirecTV appealed the interlocutory order. We have jurisdiction pursuant to Illinois Supreme Court Rule 307(a)(1) (188 Ill. 2d R. 307(a)(1)). See *Salsitz v. Kreiss*, 198 Ill. 2d 1, 11-12, 761 N.E.2d 724, 730 (2001) (an order denying a motion to compel arbitration is injunctive in nature and therefore appealable under Rule 307(a)(1)).

## ANALYSIS

DirecTV contends that the circuit court improperly analyzed the *procedural* unconscionability of the Customer Agreement as a whole. It claims that challenges to the *procedural unconscionability of* the Customer Agreement should be determined by an arbitrator, not by the circuit court.

Congress enacted the Federal Arbitration Act (9 U.S.C. §1 *et seq.* (2000)) "to reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts[] and to place arbitration agreements upon the same footing as other contracts." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24, 114 L. Ed. 2d 26, 36, 111 S. Ct. 1647, 1651 (1991). Section 2 of the Federal Arbitration Act provides that arbitration agreements governed by the Federal Arbitration Act "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. §2 (2000). Section 4 of the Federal Arbitration Act provides for orders compelling arbitration when one party has failed, neglected, or refused to comply with an arbitration agreement. 9 U.S.C. §4 (2000).

Although the Supreme Court has stressed that federal policy under the Federal Arbitration Act favors the enforcement of valid arbitration agreements (*Gilmer*, 500 U.S. at

5

24-25, 114 L. Ed. 2d at 36, 111 S. Ct. at 1651), the Court has been equally clear that a party can be forced into arbitration only if he or she has in fact entered into a valid, enforceable contract waiving his or her right to a judicial forum. *AT&T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 648, 89 L. Ed. 2d 648, 655, 106 S. Ct. 1415, 1418 (1986). Whether the parties actually agreed to arbitrate is determined under ordinary state-law contract principles. *Penn v. Ryan's Family Steak Houses, Inc.*, 269 F.3d 753, 758-59 (7th Cir. 2001). The Supreme Court has confirmed that "generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening [the Federal Arbitration Act]." *Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681, 687, 134 L. Ed. 2d 902, 909, 116 S. Ct. 1652, 1656 (1996).

"Challenges to the validity of arbitration agreements *** can be divided into two types." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444, 163 L. Ed. 2d 1038, 1042, 126 S. Ct. 1204, 1208 (2006). "One type challenges specifically the validity of the agreement to arbitrate." *Buckeye Check Cashing, Inc.*, 546 U.S. at 444, 163 L. Ed. 2d at 1042-43, 126 S. Ct. at 1208. "The other challenges the contract as a whole, either on a ground that directly affects the entire agreement (*e.g.*, the agreement was fraudulently induced)[] or on the ground that the illegality of one of the contract's provisions renders the whole contract invalid." *Buckeye Check Cashing, Inc.*, 546 U.S. at 444, 163 L. Ed. 2d at 1043, 126 S. Ct. at 1208.

In *Prima Paint Corp. v. Flood & Conklin Manufacturing Co.*, 388 U.S. 395, 18 L. Ed. 2d 1270, 87 S. Ct. 1801 (1967), the Supreme Court addressed the question of who–court or arbitrator–decides these two types of challenges. The issue in *Prima Paint Corp.* was "whether a claim of fraud in the inducement of the entire contract is to be resolved by the federal court[] or whether the matter is to be referred to the arbitrators." *Prima Paint Corp.*,

6

388 U.S. at 402, 18 L. Ed. 2d at 1276, 87 S. Ct. at 1805. Guided by section 4 of the Federal Arbitration Act, the Court held: "[I]f the claim is fraud in the inducement of the arbitration clause itself–an issue which goes to the 'making' of the agreement to arbitrate–the federal court may proceed to adjudicate it. But the statutory language does not permit the federal court to consider claims of fraud in the inducement of the contract generally." *Prima Paint Corp.*, 388 U.S. at 403-04, 18 L. Ed. 2d at 1277, 87 S. Ct. at 1806. The Court rejected the view that the question of "severability" was one of state law, so that if state law held the arbitration provision not to be severable, a challenge to the contract as a whole would be decided by the court. *Prima Paint Corp.*, 388 U.S. at 400, 402-03, 18 L. Ed. 2d at 1276-77, 87 S. Ct. at 1805-06.

Subsequently, in *Southland Corp. v. Keating*, 465 U.S. 1, 79 L. Ed. 2d 1, 104 S. Ct. 852 (1984), the Court held that the Federal Arbitration Act created a body of federal substantive law that was applicable in both state court and federal court. *Southland Corp.*, 465 U.S. at 12, 79 L. Ed. 2d at 13, 104 S. Ct. at 859. The Court rejected the view that state law could bar the enforcement of section 2 of the Federal Arbitration Act, even in the context of state-law claims brought in state court. *Southland Corp.*, 465 U.S. at 10-14, 79 L. Ed. 2d at 12-14, 104 S. Ct. at 858-60.

In *Buckeye Check Cashing, Inc.*, the Supreme Court again addressed the issue of who–court or arbitrator–decides challenges to the validity of arbitration agreements. *Buckeye Check Cashing, Inc.*, 546 U.S. at 442-49, 163 L. Ed. 2d at 1041-46, 126 S. Ct. at 1207-10. In *Buckeye Check Cashing, Inc.*, borrowers brought a putative class action in Florida state court, alleging that the lender charged usurious interest rates and that the agreement violated Florida lending and consumer-protection laws. *Buckeye Check Cashing, Inc.*, 546 U.S. at 443, 163 L. Ed. 2d at 1042, 126 S. Ct. at 1207. The lender moved to compel arbitration. *Buckeye Check Cashing, Inc.*, 546 U.S. at 443, 163 L. Ed. 2d at 1042, 126 S. Ct. at 1207.

7

The Court examined the claims alleged in the complaint to determine the nature of the challenge to the validity of the arbitration agreements. *Buckeye Check Cashing, Inc.*, 546 U.S. at 444, 163 L. Ed. 2d at 1043, 126 S. Ct. at 1208. The Court noted, "The crux of the complaint is that the contract as a whole (including its arbitration provision) is rendered invalid by the usurious finance charge." *Buckeye Check Cashing, Inc.*, 546 U.S. at 444, 163 L. Ed. 2d at 1043, 126 S. Ct. at 1208. The Court stated:

> "*Prima Paint* [*Corp.*] and *Southland* [*Corp.*] answer the question presented here by establishing three propositions. First, as a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract. Second, unless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance. Third, this arbitration law applies in state as well as federal courts. The parties have not requested, and we do not undertake, reconsideration of those holdings. Applying them to this case, we conclude that because respondents challenge the Agreement, but not specifically its arbitration provisions, those provisions are enforceable apart from the remainder of the contract. The challenge should therefore be considered by an arbitrator, not a court." *Buckeye Check Cashing, Inc.*, 546 U.S. at 445-46, 163 L. Ed. 2d at 1044, 126 S. Ct. at 1209.

The Court then reaffirmed the rule set out in *Prima Paint Corp.*, stating, "[R]egardless of whether the challenge is brought in federal or state court, a challenge to the validity of the contract as a whole, and not specifically to the arbitration clause, must go to the arbitrator." *Buckeye Check Cashing, Inc.*, 546 U.S. at 449, 163 L. Ed. 2d at 1046, 126 S. Ct. at 1210.

We consider the *procedural unconscionability* challenge by Bess in light of *Prima Paint Corp.* and *Buckeye Check Cashing, Inc.* We find that Bess's challenge is directed to the arbitration clause itself and that it is not directed to the validity of the Customer

8

Agreement as a whole. In *Buckeye Check Cashing, Inc.*, the Court made it very clear that an arbitration agreement is severable and that, when the arbitration provision itself is challenged, a court can decide whether it is enforceable. Accordingly, we conclude that the *procedural unconscionability* of the arbitration provision in the DirecTV Customer Agreement is a proper question for the circuit court.

DirecTV suggests that because the *procedural* unconscionability argument could also pertain to the contract as a whole, the validity of the arbitration clause should be decided by an arbitrator. We do not agree. In our view, *under Illinois law the procedural unconscionability* of an arbitration provision may be informed by the facts and circumstances surrounding the making of the contract, including whether the arbitration clause itself is contained within a larger contract of adhesion, and questions regarding the facts and circumstances surrounding the making of that contract are relevant in determining whether the arbitration clause itself is *procedurally* unconscionable. In a case where there are independent claims specifically challenging the *procedural unconscionability* of an arbitration provision, then the claim should be decided by the court rather than an arbitrator. Should the court determine that the arbitration provision is *procedurally* unconscionable and unenforceable, then the arbitration provision would be severed. In that case, the other challenges to the validity of the contract would not be arbitrable.

After reviewing the record, we conclude that the circuit court did not err in considering the facts and circumstances surrounding the making of the Customer Agreement as it evaluated Bess's contentions that the arbitration provision was *procedurally* unconscionable and unenforceable. Therefore, we next consider whether the court erred in finding that the arbitration provision was procedurally and substantively unconscionable.

PROCEDURAL UNCONSCIONABILITY

"A finding of unconscionability may be based on either procedural or substantive

9

unconscionability[] or a combination of both." *Kinkel v. Cingular Wireless LLC*, 223 Ill. 2d 1, 21, 857 N.E.2d 250, 263 (2006). "[T]he issue of unconscionability should be examined with reference to all of the circumstances surrounding the transaction." *Kinkel*, 223 Ill. 2d at 24, 857 N.E.2d at 265. "In addition, the doctrine of unconscionability should be at least as protective of individual consumers who enter into contracts with commercial entities as it is of one business that enters into a contract with another business." *Kinkel*, 223 Ill. 2d at 24, 857 N.E.2d at 265. "The determination of whether a contract or a portion of a contract is unconscionable is a question of law, which we review *de novo*." *Kinkel*, 223 Ill. 2d at 22, 857 N.E.2d at 264.

"Procedural unconscionability refers to a situation where a term is so difficult to find, read, or understand that the plaintiff cannot fairly be said to have been aware he was agreeing to it ***." *Razor v. Hyundai Motor America*, 222 Ill. 2d 75, 100, 854 N.E.2d 607, 622 (2006). "This analysis also takes into account the disparity of bargaining power between the drafter of the contract and the party claiming unconscionability." *Kinkel*, 223 Ill. 2d at 22, 857 N.E.2d at 264.

In this case, the circuit court concluded that the arbitration provision was procedurally unconscionable and that the procedural unconscionability was sufficient to invalidate the arbitration provision. The court's conclusion was based on its findings that the Customer Agreement was a contract of adhesion between parties in disparate bargaining positions, that the arbitration provision was inconspicuously placed in the Customer Agreement, and that Bess was deprived of a meaningful choice in entering the contract. We agree that those findings demonstrate that the arbitration provision is procedurally unconscionable to a certain extent, but we cannot agree that the degree of procedural unconscionability demonstrated, by itself, is sufficient to render the arbitration provision unenforceable. See *Kinkel*, 223 Ill. 2d at 26-27, 857 N.E.2d at 266.

10

The *Kinkel* case involved the enforceability of an arbitration provision and a class action waiver provision in Cingular Wireless, LLC's cellular telephone service agreement. *Kinkel*, 223 Ill. 2d at 5, 857 N.E.2d at 254. The Illinois Supreme Court reviewed the agreement and described it as follows:

"The Cingular service agreement is a contract of adhesion. The terms, including the arbitration clause and the class action waiver therein, are nonnegotiable and presented in fine print in language that the average consumer might not fully understand. Such contracts, however, are a fact of modern life. Consumers routinely sign such agreements to obtain credit cards, rental cars, land and cellular telephone service, home furnishings and appliances, loans, and other products and services. It cannot reasonably be said that all such contracts are so procedurally unconscionable as to be unenforceable." *Kinkel*, 223 Ill. 2d at 26, 857 N.E.2d at 266.

In *Kinkel*, the supreme court noted that the arbitration provision in the service agreement did not inform the plaintiff of the costs of the arbitration process or that she would be required to pay a portion of those costs. The supreme court found that those omissions rendered the provision procedurally unconscionable to some degree. After considering all of the circumstances surrounding the transaction, the supreme court concluded that the degree of unconscionability was insufficient, by itself, to render the class-action waiver unenforceable. *Kinkel*, 223 Ill. 2d at 27, 857 N.E.2d at 266.

Relying on the decision in *Razor*, 222 Ill. 2d 75, 854 N.E.2d 607, the dissent concludes that the arbitration provision is procedurally unconscionable in part because Bess was deprived of a meaningful choice regarding whether or not to accept the Customer Agreement. The dissent notes that the Customer Agreement was not delivered to Bess at or before the time that she signed up for the satellite service and purchased the satellite equipment, and it concludes that under those circumstances, she could not have been aware

11

of the arbitration provision at the time she agreed to contract for the service. The dissent also notes that there are other provisions in the Customer Agreement of which Bess would not have been aware. Finally, the dissent points out that the Customer Agreement states that a customer may be charged a deactivation fee for canceling service but provides no assurance that the customer can return the equipment and receive a full refund.

It is important to note that the record in the case before us is totally silent on how, when, and at what cost Bess acquired the equipment necessary to receive DirecTV's programming. Although Bess did not receive the Customer Agreement at the time she ordered the service, under the terms of the Customer Agreement, she was not bound by its terms until after she had read the Customer Agreement and continued to receive the service. Accordingly, the "deactivation fee" set forth in the 2001 Customer Agreement would not have applied to Bess had she cancelled the service upon receipt of that version of the agreement. In addition, we find the *Razor* case to be factually distinguishable from the case at bar. The *Razor* case involved the enforceability of a consequential damages disclaimer in a preprinted limited warranty. In *Razor*, the Illinois Supreme Court determined that the contents of a written warranty must be conveyed to a consumer at or before the time of the purchase,[1] and it declined to enforce the disclaimer in the absence of evidence that such had occurred. *Razor*, 222 Ill. 2d at 102-03, 854 N.E.2d at 623-24.

In contrast, the issue in this case involves the enforceability of an arbitration provision

---

[1]In its decision, the supreme court quoted from a Federal Trade Commission regulation providing that a written warranty, as a part of the basis of the bargain, " '*must be conveyed at the time of sale of the consumer product* and the consumer must not give any consideration beyond the purchase price of the consumer product in order to benefit from the agreement.' (Emphasis added.)" *Razor*, 222 Ill. 2d at 103, 854 N.E.2d at 624 (quoting 16 C.F.R. §700.11(b) (2000)).

12

in the Customer Agreement. The arbitration provision is a dispute-resolution mechanism. There is a strong public policy favoring the enforcement of arbitration agreements in Illinois. *Kinkel*, 223 Ill. 2d at 47, 857 N.E.2d at 277-78. As previously noted, the Customer Agreement at issue is typical of consumer agreements for computer, credit card, and other online or catalog purchases wherein the agreements are delivered with the product or the first billing and consumers may approve or reject the terms on receipt of the agreement. See, *e.g.*, *Kinkel*, 223 Ill. 2d at 47, 857 N.E.2d at 277-78; *Hill v. Gateway 2000, Inc.*, 105 F.3d 1147, 1149 (7th Cir. 1997). In *Hill*, the Seventh Circuit recognized that certain practical considerations support permitting vendors to enclose the legal terms with their products. "Customers as a group are better off when vendors skip costly and ineffectual steps such as telephonic recitation[] and use instead a simple approve-or-return device. Competent adults are bound by such documents, read or unread." *Hill*, 105 F.3d at 1149.

Additionally, we find that the record in this case is insufficient to support a finding that the format of the Customer Agreement was procedurally unconscionable. DirectTV's Customer Agreement begins with the following language, which is printed in capital letters and in boldface type:

> "**IF YOU DO NOT ACCEPT THESE TERMS, PLEASE NOTIFY US IMMEDIATELY AND WE WILL CANCEL YOUR SERVICE. IF YOU INSTEAD DECIDE TO RECEIVE OUR SERVICE, IT WILL MEAN THAT YOU ACCEPT THESE TERMS AND, ACCORDINGLY, THEY WILL BE LEGALLY BINDING ON YOU.**"

The dispute resolution provision in the Customer Agreement is identified with the heading "**RESOLVING DISPUTES**," and it is followed by underlined subheadings labeled "Informal Resolution" and "Formal Resolution." The arbitration language is contained under the "Formal Resolution" subheading. It is printed in capital letters and in boldface type, and

it states: "**ARBITRATION MEANS YOU WAIVE YOUR RIGHT TO A JURY TRIAL**." Nothing in this record suggests that the plaintiff could not locate, read, or understand these provisions.

In this case, we find that there are circumstances, including DirecTV's failure to inform Bess of the arbitration provision prior to or at the time that she purchased its satellite television service, that evidence a degree of procedural unconscionability. But, after considering the circumstances of the transaction, we find that the degree of procedural unconscionability in the Customer Agreement is insufficient to render the arbitration provision unenforceable.

SUBSTANTIVE UNCONSCIONABILITY

We next consider whether the circuit court erred in concluding that the arbitration provision was substantively unconscionable because the costs Bess would incur in bringing a class action in arbitration are prohibitive.

Where a party seeks to invalidate an arbitration provision on the ground that the arbitration would be prohibitively expensive, that party has the burden to show the likelihood of incurring those costs. *Green Tree Financial Corp.–Alabama v. Randolph*, 531 U.S. 79, 92, 148 L. Ed. 2d 373, 384, 121 S. Ct. 513, 522 (2000). In order to meet her burden, the party must provide some individualized evidence to show that she is likely to face prohibitive costs in the arbitration and that she is financially incapable of meeting those costs. *Livingston v. Associates Finance, Inc.*, 339 F.3d 553, 557 (7th Cir. 2003). An arbitration provision is not rendered inherently unconscionable because some of the arbitration costs will be imposed on the customer. See *Zobrist v. Verizon Wireless*, 354 Ill. App. 3d 1139, 1146, 822 N.E.2d 531, 539-40 (2004) (citing *Green Tree Financial Corp.–Alabama*, 531 U.S. at 91-92, 148 L. Ed. 2d at 384, 121 S. Ct. at 522-23). Therefore, we turn to the record to ascertain whether Bess presented sufficient evidence to show that her share of the

14

expenses of arbitration would be cost-prohibitive.

After this case was remanded to the circuit court following the initial appeal (*Bess*, 351 Ill. App. 3d at 1157, 815 N.E.2d at 462), Bess filed a motion in opposition to DirecTV's motion to compel arbitration, and a memorandum of law, with exhibits, in support of her motion. Therein, Bess argued that the arbitration provision was void because she would be saddled with prohibitive costs. She attached copies of the Customer Agreement from October 1999 and September 2001 (collectively, parts of "Exhibit 1") in support of her argument. Those documents state in pertinent part as follows:

"If you initiate the arbitration, you agree to pay a fee of $125 or, if less and you tell us in writing, the amount that you would pay to initiate a lawsuit against us in the appropriate court of law in your state. *We agree to pay any additional fee or deposit required by the American Arbitration Association in excess of your filing fee.* We also agree to pay the costs of arbitration proceeding up to a maximum of one-half day (four hours) of hearings. Other fees, such as attorney's fees, expenses of travel to the arbitration[,] and the costs of a proceeding that goes beyond one-half day[,] will be paid in accordance with the AAA Rules. The arbitration will be held at a location within one hundred miles of your residence unless you and we both agree to another location." (Emphasis added.)

The second exhibit ("Exhibit 2") is a printout of the Supplementary Procedures for Consumer-Related Disputes, issued by the American Arbitration Association (AAA) and effective March 1, 2002. This document contains the following relevant provisions:

"**C-8. Administrative *Fees* and Arbitrator *Fees***

Administrative *fees* and arbitrator compensation deposits are due from the claimant at the time a case is filed. They are due from the respondent at the time the answer is due. The amounts paid by the consumer and the business are set forth

15

below.

**Administrative *Fees***

Administrative *fees* are based on the size of the claim and counterclaim in dispute. They are based only on the actual damages and not on any additional damages, such as attorneys' fees or punitive damages. These *fees* are nonrefundable.

**Arbitrator *Fees***

\*\*\*

For cases in which a claim or counterclaim exceeds $75,000, arbitrators are compensated at the rates set forth on their panel biographies.

***Fees and Deposits* to be Paid by the Consumer**:

\* \* \*

If the consumer's claim or counterclaim exceeds $75,000, or if the consumer's claim or counterclaim is non[]monetary or undetermined, then the consumer must pay an Administrative Fee in accordance with the Commercial Fee Schedule. This *fee* is nonrefundable. The consumer must also *deposit* one-half of the arbitrator's compensation. This *deposit* is used to pay the arbitrator. This *deposit* is refunded if not used. The arbitrator's compensation rate is set forth on the panel biography provided to the parties when the arbitrator is appointed." (Emphases added.) Am. Arb. Ass'n, Supplementary Procedures for Consumer-Related Disputes, R. C-8, eff. March 1, 2002.

The next exhibit ("Exhibit 3") is a printout of the AAA's Supplementary Rules for Class Arbitrations, effective October 8, 2003. This document contains the following relevant provisions:

**"1. Applicability**

(a) These Supplementary Rules for Class Arbitrations ('Supplementary Rules')

16

shall apply to any dispute arising out of an agreement that provides for arbitration pursuant to any of the rules of the American Arbitration Association ('AAA') where a party submits a dispute to arbitration on behalf of or against a class or purported class, and shall supplement any other applicable AAA rules. These Supplementary Rules shall also apply whenever a court refers a matter pleaded as a class action to the AAA for administration ***.

\* \* \*

### 11. Administrative Fees and Suspension for Nonpayment

(a) A preliminary *filing fee* of $3,250 is payable in full by a party making a demand for treatment of a claim, counterclaim, or additional claim as a class arbitration. The preliminary filing fee shall cover all AAA administrative fees through the rendering of the Clause Construction Award. If the arbitrator determines that the arbitration shall proceed beyond the Clause Construction Award, a supplemental *filing fee* shall be paid by the requesting party. The supplemental *filing fee* shall be calculated based on the amount claimed in the class arbitration and in accordance with the fee schedule contained in the AAA's Commercial Arbitration Rules." (Emphases added.) Am. Arb. Ass'n, Supplementary Rules for Class Arbitrations, eff. October 8, 2003.

The fourth exhibit that was attached to Bess's supporting memorandum is titled "Affidavit of Plaintiff's Attorney." In the affidavit, Francis J. "Casey" Flynn, an attorney who works for the law firm of Carey & Danis, LLC, states that he conducted research and inquiry on behalf of Bess in order to ascertain the costs involved in an AAA arbitration where a plaintiff requests a class arbitration. According to the affidavit, Flynn learned that in cases where the class is certified by the arbitrator, a supplemental filing fee is calculated based on the amount claimed in the class arbitration. If the amount of the damages requested by the

17

plaintiff in the class arbitration is undetermined, the plaintiff must file a $10,000 administrative filing fee, though the $3,250 preliminary filing fee is credited to this amount. If $500 million in damages is at issue, the administrative filing fee is $61,500. The administrative filing fee is capped at $65,000, regardless of the sum of the damages sought. The administrative filing fee is separate from the arbitrator's compensation, and the arbitrator's compensation varies depending on the fees of the particular arbitrator.

Bess also filed a reply memorandum and attached the AAA's Commercial Arbitration Rules and Mediation Procedures (Including Procedures for Large, Complex Commercial Disputes), effective July 1, 2003. The rules provide that the fees for the arbitrator and the reporting services may be assessed in addition to the other administrative fees. The rules also provide, "All other expenses of the arbitration, including travel and other expenses of the arbitrator, AAA representatives, and any witness and the cost of any proof produced at the direct request of the arbitrator, shall be borne equally by the parties, unless they agree otherwise ***." Am. Arb. Ass'n, Commercial Arbitration Rules and Mediation Procedures (Including Procedures for Large, Complex Commercial Disputes), R. R-50, eff. July 1, 2003. However, there is also a provision in a footnote to the rules that states as follows:

"The AAA applies the Supplementary Procedures for Consumer-Related Disputes to arbitration clauses in agreements between individual consumers and businesses where the business has a standardized, systematic application of arbitration clauses with customers and where the terms and conditions of the purchase of standardized, consumable goods or services are nonnegotiable or primarily non[]negotiable in most or all of its terms, conditions, features, or choices. The product or service must be for personal or household use." Am. Arb. Ass'n, Commercial Arbitration Rules and Mediation Procedures (Including Procedures for Large, Complex Commercial Disputes, R. R-1, n.*, eff. July 1, 2003.

18

The arbitration clause in the case at bar fits squarely within this provision. Therefore, we find that any expenses set forth in the commercial procedures are irrelevant to our analysis.

After reviewing the arguments and exhibits in the record, we conclude that Bess did not meet her burden to show that her share of the arbitration fees would be cost-prohibitive and that she is financially incapable of meeting those costs. First, we note that the record contains no information regarding Bess's financial position. Second, and most important, the plain language of the arbitration clause at issue makes clear that DirecTV has agreed to pay all fees and deposits required by the AAA over and above $125. All expenses of initiating arbitration, as set forth by the AAA in its Supplementary Procedures for Consumer-Related Disputes and Supplementary Rules for Class Arbitrations, are classified as either fees or deposits. The expenses include an initial or preliminary filing fee, a supplementary filing fee, and an initial deposit of half of the arbitrator's compensation.

We find nothing in Bess's submissions to indicate that Bess will be responsible for any other costs of the arbitration, such as the travel and expenses of the arbitrator, AAA representatives, or any witnesses, and the cost of any proof produced at the direct request of the arbitrator. As explained above, the AAA's Commercial Arbitration Rules and Mediation Procedures (Including Procedures for Large, Complex Commercial Disputes) expressly exempt disputes based on an arbitration clause found in a standardized, nonnegotiable contract for household goods and services. Neither the Supplementary Procedures for Consumer-Related Disputes nor the Supplementary Rules for Class Arbitrations provide for payments of such expenses.

We conclude that the evidence in the record does not support the claim that class arbitration would be cost-prohibitive for the plaintiff, and we conclude that the circuit court erred in determining that the arbitration provision was substantively unconscionable on that basis.

SUMMARY AND CONCLUSION

We conclude that the degree of procedural unconscionability regarding the arbitration provision in the Customer Agreement is insufficient to render the arbitration provision unenforceable on that basis. We further conclude that the evidence in the record does not support the claim that class arbitration would be cost-prohibitive for the plaintiff, and we conclude that the circuit court erred in determining that the arbitration provision was substantively unconscionable on that basis.

Accordingly, we reverse the judgment of the circuit court, and we remand the case to the circuit court with directions to enter an order (1) granting DirecTV's motion to compel arbitration, (2) directing that DirecTV shall pay all fees and costs in excess of $125 charged by the AAA in connection with the arbitration proceedings, whether this matter is resolved individually or as a class (Rule 12(b) of the Supplementary Rules for Class Arbitration states, "It is the policy of the AAA to comply with any order of a court directed to the parties to an arbitration or with respect to the conduct of an arbitration ***" (Am. Arb. Ass'n, Supplementary Rules for Class Arbitrations, R. 12(b), eff. October 8, 2003)), and (3) staying all judicial proceedings in that court pending the resolution of the arbitration.


Reversed; cause remanded with directions.


SPOMER, J., concurs.


PRESIDING JUSTICE STEWART,[2] concurring in part and dissenting in part:

---

[2]Originally, Justice McGlynn was assigned to this panel. Presiding Justice Stewart was later substituted on the panel. He has reviewed the briefs and listened to the audiotape of oral argument.

I concur with the majority in its decision that the issue of procedural unconscionability should be determined by the court, not the arbitrator. I also concur in its determination that the circuit court erred in finding that the arbitration provision of the Customer Agreement is substantively unconscionable because class arbitration would be cost-prohibitive for the plaintiff. Under the facts of this case, I agree that the plaintiff failed to meet her burden of proof that she is incapable of meeting those costs.

I respectfully dissent, however, from the decision of the majority that the arbitration provision in the Customer Agreement is not procedurally unconscionable. In this case, the circuit court found the arbitration provision contained in the Customer Agreement procedurally unconscionable, stating:

"The arbitration provision is procedurally unconscionable because it is printed in *** about eight[-]point font in a ten[-]paneled[3] fold[]up pamphlet with each panel of the pamphlet containing approximately seven-hundred *** words. The 'Customer Agreement' is force[-]fed to subscribers *** on a take[-]it[-]or[-]heave[-]it [*sic*] basis. There is no opportunity for a consumer to negotiate the terms of the document. The provision regarding arbitration is inconspicuously placed in the pamphlet, where it was unlikely to be noticed, much less read, and sent after the purchase and installation of the equipment and after service had already begun."

I agree with this analysis and I would affirm the circuit court's judgment denying DirecTV's motion to stay proceedings and to compel arbitration.

It is clear that, despite DirecTV's claims to the contrary, its Customer Agreement containing the arbitration provision is an adhesion contract under Illinois law. The

[3]In fact, the 2001 Customer Agreement, to which the circuit court referred, has only eight panels. The 2004 Customer Agreement, which is not at issue in this appeal, has 10 panels.

21

parties–Bess, a consumer, and DirecTV, a nationwide provider of satellite television services–are in disparate bargaining positions. In addition, the Customer Agreement containing the arbitration provision is a form contract, which Bess had no hand in drafting and which DirecTV offered to Bess on a take-it-or-leave-it basis. See *Williams v. Illinois State Scholarship Comm'n*, 139 Ill. 2d 24, 72, 563 N.E.2d 465, 487 (1990) (an adhesion contract is one in which the parties are in disparate bargaining positions and one party has no hand in drafting the agreement but, instead, must "take it or leave it" as the other party drafted it).

However, "the fact that a contract is offered in a form contract on a take-it-or-leave-it basis does not automatically render a contract term procedurally unconscionable." *Kinkel v. Cingular Wireless, LLC*, 357 Ill. App. 3d 556, 563, 828 N.E.2d 812, 818 (2005), *aff'd*, 223 Ill. 2d 1, 857 N.E.2d 250 (2006). As the majority points out, the Illinois Supreme Court noted in *Kinkel*:

> "Such contracts *** are a fact of modern life. Consumers routinely sign such agreements to obtain credit cards, rental cars, land and cellular telephone service, home furnishings and appliances, loans, and other products and services. It cannot reasonably be said that all such contracts are so procedurally unconscionable as to be unenforceable." *Kinkel*, 223 Ill. 2d at 26, 857 N.E.2d at 266.

"This, of course, does not mean that offering a contract term on a take-it-or-leave-it basis is irrelevant in determining whether a contract provision is procedurally unconscionable; indeed, it is an important factor to consider." *Kinkel*, 357 Ill. App. 3d at 563, 828 N.E.2d at 818-19. "It simply means that something more is required before we find a provision to be procedurally unconscionable." *Kinkel*, 357 Ill. App. 3d at 563, 828 N.E.2d at 819. "Illinois courts have long found provisions offered on a take-it-or-leave-it basis and also 'hidden in a maze of fine print' to be procedurally unconscionable." *Kinkel*, 357 Ill. App. 3d at 563, 828

22

N.E.2d at 819 (quoting *Frank's Maintenance & Engineering, Inc. v. C.A. Roberts Co.*, 86 Ill. App. 3d 980, 989-90, 408 N.E.2d 403, 410 (1980)).

As the Illinois Supreme Court further noted in *Kinkel*:

" 'Procedural unconscionability consists of some impropriety during the process of forming the contract depriving a party of a meaningful choice. [Citations.] Factors to be considered are all the circumstances surrounding the transaction[,] including the manner in which the contract was entered into, whether each party had a reasonable opportunity to understand the terms of the contract, and whether important terms were hidden in a maze of fine print; both the conspicuousness of the clause and the negotiations relating to it are important, albeit not conclusive factors in determining the issue of unconscionability. [Citation.] To be a part of the bargain, a provision *** must *** have been bargained for [or] brought to the [consumer's] attention or be conspicuous. *** This requirement that the seller obtain the knowing assent of the buyer "does not detract from the freedom to contract, unless that phrase denotes the freedom to impose the onerous terms of one's carefully drawn printed document on an unsuspecting contractual partner. Rather, freedom to contract is enhanced by a requirement that both parties be aware of the burdens they are assuming. The notion of free will has little meaning as applied to one who is ignorant of the consequences of his acts." [Citation.]' " *Kinkel*, 223 Ill. 2d at 23-24, 857 N.E.2d at 264-65 (quoting *Frank's Maintenance & Engineering, Inc.*, 86 Ill. App. 3d at 989-90, 408 N.E.2d at 410).

In *Razor v. Hyundai Motor America*, 222 Ill. 2d 75, 854 N.E.2d 607 (2006), the Illinois Supreme Court clarified the type of additional circumstance that will render an adhesion contract with a consumer unconscionable and unenforceable. The contractual provision at issue in that case was a consequential damages disclaimer in a limited warranty.

23

The evidence revealed that the disclaimer and warranty were contained in an owner's manual in the glove compartment of the vehicle purchased by the plaintiff. The plaintiff never saw the disclaimer until after the purchase, and the sale contract made no mention of the disclaimer. The court noted the plaintiff's arguments that the disclaimer was on a preprinted form offered on a take-it-or-leave-it basis, and then it stated:

"However, we need not–and we do not–hold that these general circumstances alone or in combination render the clause unconscionable.

An additional fact particular to this case tips the balance in plaintiff's favor. That is the lack of evidence that the warranty, which contained the disclaimer of consequential damages, had been made available to the plaintiff at or before the time she signed the sale contract. ***

*** [P]rocedural unconscionability refers to a situation where a term is so difficult to find, read, or understand that the plaintiff cannot fairly be said to have been aware he was agreeing to it. Surely, whatever other context there might be in which a contractual provision would be found to be procedurally unconscionable, that label must apply to a situation such as the case at bar where plaintiff has testified that she never saw the clause; nor is there any basis for concluding that plaintiff *could* have seen the clause, before entering into the sale contract." (Emphasis in original.) *Razor*, 222 Ill. 2d at 100-02, 854 N.E.2d at 623.

Although the majority attempts to distinguish *Razor* because the clause at issue was a warranty governed by regulations of the Federal Trade Commission (FTC), a close reading of the opinion makes it clear that the court's decision is based squarely upon the law of unconscionability. In fact, the court notes that the FTC regulations were only raised upon rehearing and simply "validated [the court's] legal analysis." *Razor*, 222 Ill. 2d at 103, 854 N.E.2d at 624.

24

In the present case, DirecTV argues that the arbitration provision in the Customer Agreement is conspicuous. The arbitration provision is separated by a break in the text and is identified by a heading printed in bold, all-capitalized letters that states: "**RESOLVING DISPUTES**." However, the arbitration provision is printed in single-spaced lines of very small font on the last two panels of the multipaneled foldup pamphlet. Moreover, as the Illinois Supreme Court explained in *Razor*, "It simply does not matter how large the type was or how clearly the disclaimer was expressed if the consumer did not have the opportunity to *see* the language before entering into the contract \*\*\*." (Emphasis in original.) *Razor*, 222 Ill. 2d at 101, 854 N.E.2d at 623.

In this case, it is undisputed that DirecTV did not mail Bess a copy of the Customer Agreement containing the arbitration provision until after she had already acquired the satellite television equipment and after she had contracted to receive DirecTV service. Therefore, Bess did not see, and could not have seen, the arbitration provision before entering into the contract with DirecTV. Accordingly, as the Illinois Supreme Court stated in *Razor*, "[s]urely, whatever other context there might be in which a contractual provision would be found to be procedurally unconscionable, that label must apply to a situation such as the case at bar" (*Razor*, 222 Ill. 2d at 101, 854 N.E.2d at 623), where Bess did not see and could not have seen the arbitration provision before entering into the contract.

DirecTV argues that although it sent Bess the Customer Agreement after she had contracted for DirecTV service, she had the opportunity to cancel the service if she rejected the terms of the arbitration provision. Thus, the majority asserts, "[T]he Customer Agreement at issue is typical of consumer agreements for computer, credit card, and other online or catalog purchases wherein the agreements are delivered with the product or the first billing and consumers may approve or reject the terms on receipt of the agreement." Slip op. at 13. As authority for this proposition, the majority cites *Kinkel* and *Hill v. Gateway 2000,*

25

*Inc.*, 105 F.3d 1147 (7th Cir. 1997). In *Kinkel*, however, the plaintiff had actually *signed* the customer agreement for cellular telephone services before services commenced. *Kinkel*, 223 Ill. 2d at 5, 857 N.E.2d at 254. Likewise, in *Hill*, the customer agreement was in the box with the computer the plaintiff had ordered from the defendant, and the agreement provided that the customer could avoid the entire transaction by returning the computer within 30 days, without penalty. *Hill*, 105 F.3d at 1148. Contrary to the majority's claim, I have found no case based upon Illinois law validating an adhesion contract in a consumer transaction where the consumer did not receive the initial written agreement until some time after the consumer commenced receiving the services for which she contracted.

In this case, by the time Bess received the Customer Agreement, she had already acquired the satellite television equipment, the equipment had already been installed, and Bess had ordered and was receiving DirecTV's services. The Customer Agreement did not provide for the reimbursement of her equipment costs if she chose to discontinue the service instead of accepting the terms of the arbitration provision; nor is there any indication in the record that she could have returned the equipment without incurring a penalty. Further, the 2001 version of the Customer Agreement provides for a "deactivation fee" if a customer cancels service. It is clear that DirecTV required Bess to contract to receive its service and substantially change her economic position *before* she was provided with the Customer Agreement that contained the arbitration provision. In order to cancel service at that point, *after* she had taken all necessary steps to be a DirecTV subscriber, she would have had to suffer the time, effort, and expense associated with switching to another service provider. Therefore, Bess was deprived of a " 'meaningful choice' " in determining whether to accept the arbitration provision of the Customer Agreement. See *Kinkel*, 223 Ill. 2d at 23, 857 N.E.2d at 264 (quoting *Frank's Maintenance & Engineering, Inc.*, 86 Ill. App. 3d at 989, 408 N.E.2d at 410).

Although the majority relies heavily upon the fact that the record in this case is silent on how Bess obtained her equipment, the routine manner in which DirecTV contracts with its customers is not in dispute. In this court's previous decision in this case, the ordinary transaction was described as follows:

> "DirecTV provides television programming services via satellite to consumers throughout the nation. To obtain these services, a potential DirecTV subscriber typically first purchases from an independent retailer the equipment necessary to receive a satellite signal. The potential customer then calls DirecTV and selects one or more of DirecTV's programming packages. DirecTV then activates the subscriber's service and mails the customer a copy of the parties' written contract, entitled 'Customer Agreement' (Customer Agreement), along with his or her first bill. The Customer Agreement sets forth the parties' rights and obligations and explains the terms and conditions pursuant to which DirecTV provides its service." *Bess v. DirecTV, Inc.*, 351 Ill. App. 3d 1148, 1149, 815 N.E.2d 455, 456 (2004).

In its statement of facts in its brief before this court, DirecTV adopted the above statement verbatim.

I see little difference between the circumstances in *Razor*, where the consumer did not have an opportunity to see the warranty disclaimer until after the purchase, and the circumstances here where the consumer has no opportunity to see the arbitration provision until she has acquired the equipment and contracted for services. As a practical matter, DirecTV's offer to cancel service if a consumer does not agree with its contract is virtually meaningless given that the consumer must then suffer the time, effort, and expense of contracting with another television service provider. The majority's decision allows DirecTV to "hook" the consumer into using its product and then impose upon the consumer its carefully drawn contract when it is far less likely to be rejected.

27

Given all the circumstances in the present case, I believe that the arbitration provision is procedurally unconscionable and that the procedural unconscionability is sufficient to invalidate the arbitration provision. The parties–Bess, a consumer, and DirecTV, a nationwide provider of satellite television services–were in disparate bargaining positions. The Customer Agreement containing the arbitration provision was a preprinted form contract, and it was a contract of adhesion in that Bess had no hand in drafting it but, instead, had to "take it or leave it" as DirecTV drafted it. The arbitration provision was printed in single-spaced lines of very small font on the last two panels of a multipaneled pamphlet, which DirecTV mailed to Bess along with her monthly bill after Bess had already acquired satellite television equipment, the equipment had already been installed, and Bess had already contracted to receive DirecTV service. Accordingly, Bess had not seen and could not have seen the arbitration provision before entering into the contract with DirecTV. See *Razor*, 222 Ill. 2d at 101, 854 N.E.2d at 623. Under the terms of the Customer Agreement, if Bess had opted to discontinue her DirecTV service instead of accepting the terms of the arbitration provision, DirecTV did not agree to reimburse her for the cost of the equipment; nor is there any indication in the record that she could have returned the equipment without incurring a penalty. Under these circumstances, I believe it would be unconscionable to enforce the arbitration provision, because Bess was deprived of a " 'meaningful choice' " in accepting the terms of the Customer Agreement. See *Kinkel*, 223 Ill. 2d at 23, 857 N.E.2d at 264 (quoting *Frank's Maintenance & Engineering, Inc.*, 86 Ill. App. 3d at 989, 408 N.E.2d at 410).

For the foregoing reasons, I would affirm the order of the circuit court of St. Clair County denying DirecTV's motion to stay proceedings and to compel arbitration.

NO. 5-05-0394

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | |
|---|---|
| CHARLOTTE BESS, | ) Appeal from the |
| | ) Circuit Court of |
| Plaintiff-Appellee, | ) St. Clair County. |
| | ) |
| v. | ) No. 99-L-55A |
| | ) |
| DIRECTV, INC., | ) Honorable |
| | ) Robert P. LeChien, |
| Defendant-Appellant. | ) Judge, presiding. |

---

**Opinion Filed**:  March 18, 2008

---

**Justices**:  Honorable James K. Donovan, J.

Honorable Stephen L. Spomer, J.,
Concurs
Honorable Bruce D. Stewart, P.J.,
Concurs in part and dissents in part

---

**Attorneys for Appellant**  Joseph B. McDonnell, Greensfelder, Hemker & Gale, 12 Wolf Creek Drive, Swansea, IL 62226; Melissa D. Ingalls, Glen G. Mastroberte, Kirkland & Ellis, LLP, 777 South Figueroa Street, Los Angeles, CA 90017

---

**Attorneys for Appellee**  David A. Nester, Nester & Constance, P.C., 123 West Washington Street, Belleville, IL 62220; Steven A. Katz, Diane Moore Heitman, Carr, Korein, Tillery, Kunin, Montroy, Cates & Glass, 10 Executive Woods Court, Belleville, IL 62226; Michael J. Flannery, James J. Rosemergy, Carey & Danis, L.L.C., 8235 Forsyth Blvd., St. Louis, MO 63105